KANSAS CITY, FT. S. & M. R. CO. v. KING, Comptroller.

(Circuit Court of Appeals, Sixth Circuit. June 19, 1902.)

No. 1,113.

1. TAXATION—SUIT FOR INJUNCTION—EQUITY JURISDICTION.

Where an assessment of railroad property by a state is valid on its face, and the tax levied on such assessment becomes a lien apparently valid, which casts a cloud upon the title to the property, a federal court of equity has jurisdiction of a suit to inquire into the validity of the proceedings, and remove the cloud, by enjoining the collection of the tax, if the assessment shall be shown to be illegal.

2. SAME.

Where the method of assessing the property of a railroad company adopted by a state board is within the powers conferred on it by statute, and does not result in an excessive valuation as compared with the property of other railroads, a court of equity is not authorized to enjoin the levy and collection of taxes thereon because, owing to the peculiar nature of the property of such company within the state, the method so adopted was different from that applied to other roads.

Appeal from the Circuit Court of the United States for the Middle District of Tennessee.

The complaint in this case is against illegal and discriminating taxation of the property of the Kansas City, Ft. Scott & Memphis Railroad Company, at Memphis, Tenn., the collection of which is sought to be enjoined. By the law of Tennessee (chapter 5, Acts 1897) a special method of taxing railroad property in that state is provided. Three commissioners are constituted ex officio the state tax assessors of railroads. These commissioners are to meet on the first Monday in May, and organize by selecting one of their number as president and choosing a secretary. It is made the duty of the owners of any railroad, telegraph, or telephone company in the state to file with the State Comptroller on or before May 1, 1897, and biennially thereafter, certain schedules. That required of common carriers owning

railroad property is to set forth a statement of all of its property, real, personal, and mixed, owned or leased by the company, setting forth therein the length in miles of its entire roadbed, switches, and side tracks, showing the number of miles lying in the state, in each county of the state, and each incorporated town therein, and the value of the whole, the amount of the capital stock, bonded debt, the gross annual receipts of the preceding fiscal year, the number of cars, their classes and value, the number of engines and their value, the location, description, and value of all depot buildings, warehouses, and other real estate, where located, and all real, personal, and mixed property belonging to the company, not before enumerated, together with its value. This schedule is required to be verified upon oath, and duly filed with the Comptroller. This officer is to turn the same over to the state tax assessors "and they shall immediately proceed to ascertain the value of said property for taxation." Sections 5, 6, 7, 8, and 10 of the act are as follows:

"Sec. 5. Be it further enacted, that said state tax assessors, in arriving at the valuation of said property, shall have in view, and look to, the capital stock, the corporate property, franchises of each company, and the gross receipts; and the market value of the shares of stock and bonded debt; and to ascertain these facts they are hereby invested with the power to summon before them any person or persons and call for any books, administer oaths, and examine any such person or books touching any matters deemed necessary to enable them to arrive at the correct value of such property; and they may issue summons to any county in the state to be executed by the sheriff of such county. Any person so called on to testify shall be guilty of perjury, if he shall testify falsely; and any person failing to attend when summoned, shall be guilty of a misdemeanor punishable by fine of $100 and thirty days in jail.

"Sec. 6. Be it further enacted, that the road of any railroad property shall include all said tracks, switches, bridges, trestles, ties, rails and superstructure of every kind; that the line of any telegraph or telephone company shall include all wires, poles, instruments and rights of way.

"Sec. 7. Be it further enacted, that the roadbed, rolling stock, franchises, choses in action and personal property of a railroad company having no actual situs, shall be known as distributable property; and shall be valued separately from the other property; and after ascertaining the total value of such distributable property wherever situated, and after having deducted from this value $1,000, said assessors shall divide the remainder by the number of miles of the entire length of the road, and the result shall be the value per mile of such distributable property for the purpose of taxation; and the value per mile of such distributable property shall be multiplied by the number of miles in this state, and the product thereof shall be the sum to be assessed against such property for state purposes; and the value per mile so ascertained shall be multiplied by the number of miles in each county or incorporated city, and the product shall be the amount to be assessed upon such property by said counties and incorporated towns, respectively.

"Sec. 8. Be it further enacted, that the depot buildings and other property, real, personal and mixed, having an actual situs, shall be known as the localized property of such railroad, and shall be valued separately accordingly as the same may be located in any of the counties or incorporated towns in this state."

"Sec. 10. Be it further enacted, that said assessors shall in addition to the schedules hereinbefore required, take such additional proof and require such additional information of the value of any property to be assessed by them as may be deemed proper, but such additional evidence shall be reduced to writing and an opportunity afforded, if desired, to the owner of any property, to submit additional evidence or counter evidence to that required by said assessors, and the records of the assessors shall at all times be open to inspection to the owner or owners of any property assessable under the provisions of this act."

The owner of the property is authorized to appear and file exceptions to the assessment. After the state tax assessors have made their assessment

the same goes for final action to a board of equalization composed of the Governor, Treasurer, and Secretary of State. This board examines the assessment, and is authorized to increase or diminish the valuation placed upon the property, to require of the assessors additional evidence if desired. And the assessment is not deemed complete until corrected and approved by the board of equalization. Its valuation is conclusive and final. The tax is distributed by the Comptroller to the state, counties, and towns according to their respective interests, and becomes a lien upon the property from the 10th day of January of the year for which they are assessed. Other provisions are inserted, looking to the prompt collection of the tax so assessed.

The complainant company is not incorporated in Tennessee. It has its main line from a point on the west branch of the Mississippi river, and runs thence westwardly. It is a consolidated corporation under the laws of Kansas, Missouri, and Arkansas. At a point in Arkansas opposite Memphis on the Mississippi river it connects with the line owned and operated by the Kansas City, Memphis Railway & Bridge Company, by means of which trains of the appellant company are transported across the Mississippi river and into the city of Memphis, where it owns the property which has been assessed for taxation in Tennessee.

The appellant claims to operate in Tennessee under Act 1871, c. 55 (Shannon's Code, § 1488). This act, under certain conditions, grants to railroads of other states which intersect the line of the state of Tennessee at a point within five miles of any railroad in the state the right of way from such point of intersection to any point on the line of the road in the state, provided that such point of connection between the roads shall not be more than five miles distant from the state line. The property of the railroad company in Memphis consists principally of its terminals in that city, consisting of a large number of tracks and other facilities for storing cars, making up trains, connection with business plants and other railroads. The board of assessors, as to this property, for the years 1899 and 1900, after considering the testimony before it, made report to the state board of equalization as follows:

"Kansas City, Fort Scott & Memphis Railroad Company.

"Report of the Tennessee Railroad Commission, acting ex officio as state tax assessor of railroad, telegraph, and telephone property, made to the state board of equalizers upon the assessment of the property of the Kansas City, Fort Scott & Memphis Railroad Company for the years 1899 and 1900.

"History of Carrier.

"Length of Line and Terminal.

"This corporation was formed April 24, 1880, by the consolidation, in accordance with the laws of Kansas, Missouri, and Arkansas, of the following lines of railroad, to wit: Fort Scott & Springfield Railroad Company, Kansas City, Springfield & Memphis Railroad Company. The first of said lines (Fort Scott & Springfield Railroad) had been previously formed by consolidation with the following lines, said consolidation being under the laws of Kansas, viz.: Kansas City, Fort Scott & Gulf Railroad Company, Rich Hill Railroad Company, Fort Scott, Southeastern & Memphis Railroad Company, Short Creek & Joplin Railroad Company, Kansas & Missouri Railroad Company, Memphis, Kansas & Colorado Railroad Company. The Kansas City, Springfield & Memphis Railroad Company had been previously formed by the consolidation of the following lines under the laws of Missouri and Arkansas, viz.: Springfield & Memphis Railroad Company. This road runs from Kansas City, Missouri, to Memphis, Tennessee, with a number of branch lines in Kansas, Missouri, and Arkansas. Interrogatories were propounded by the commission to this company, which have been answered under oath, but answered in such a way as to throw very little light on the main questions sought by the commission in order to make their assessment. In said interrogatories the length of the line is given as 675.19

miles, length of side tracks 226.75 miles; total, 901.94 miles. In their schedule the company set out mileage in Tennessee as follows:

Main track in Tennessee................................... 0.40 miles
Side track ............................................. 18.51 miles

Total ............................................. 18.91 miles

"In the annual statement by the company to its stockholders for the fiscal year 1898, page 7, the total mileage for this system is set out as follows:

Total mileage ......................................... 959.50 miles
And the mileage in Tennessee is placed at................. 21.16 miles

"The railroads that compose the system were all constructed under charters obtained from the states of Kansas, Missouri, and Arkansas, under corporate existence extending to the line between Tennessee and Arkansas. They have no charters from the state of Tennessee. In fact, their property in Tennessee consists alone of terminal facilities in the city of Memphis, the value of which is difficult to ascertain under the schedule and deposition filed by the company.

"In order to arrive at the valuations set out in this brief of assessment, the commission has had largely to depend on facts obtained from said annual statement, which are presumed to be correct, together with such facts as can be gathered from the said deposition taken by the commission on interrogatories. (Depositions of E. S. Washburn, filed July 6, 1899.)

"Stock.

"In deposition of Mr. Washburn he places the stock as follows:

Common stock ........................................... $9,898,000
Preferred stock ......................................... 2,750,000

"In quotation Supplement Financial Chronicle, for January, 1899, the common stock (p. 25) is quoted at 10c. and the preferred stock at 50c.

Actual value of stock ...................................... $1,473,980
Actual value of stock per mile (959.50 miles)................. 1,537

"Bonds.

"This property is covered by the following bonds:

Kansas City, Fort Scott & Gulf R. R.......................... $ 2,197,000
Fort Scott, Southeastern & Memphis R. R..................... 571,000
Short Creek & Joplin R. R.................................... 94,000
Kansas & Missouri R. R...................................... 390,000
Memphis, Kansas & Colorado R. R............................ 492,000
Kansas City, Fort Scott & Memphis R. R..................... 13,617,000

Total bonded debt (see p. 36, annual statement 1898).... $17,361,000

"For the purpose of this calculation we have considered all these bonds at par value. They range from 95c. to $1.15 (see quotation Supplement Commercial & Financial Chronicle, January, 1899, p. 22), which would make them aggregate about par, or a little over.

"Average value bonds held per mile (959.50) miles, $18,093.00.

"Earnings—Gross and Net.

The net earnings as per deposition of Mr. Washburn were.. $ 1,119,427 16
According to the annual statement for 1898 (see pages 8
  and 33) the gross earnings were........................ 4,595,084 85
Operating expenses including taxes were.................. 3,199,337 56
Net earnings ............................................ 1,405,747 29
Or per mile net earnings (959.50)........................ 1,464 00
Making the entire road (959.50) miles worth as a 10 per
  cent. investment the sum of............................ 14,057,472 90
Or per mile of road...................................... 14,640 00
The cost of the property (p. 28, annual statement 1898).... 25,519,775 80

"It, however, would not be equitable to average, on mileage basis, either the cost, stock, bond, or net earnings of the road, for the reason that this would place all lines—main line, branches, and side track—on the same valuation, whereas one is worth more than the other, has greater earning capacity, etc. The side tracks in Memphis are worth more than the side tracks in the country along the various sides of the road. These various calculations are simply made so as to approximately arrive at some valuation on which to make assessment of the property; the railroad company having failed to give sufficient data on which the commission could arrive at a satisfactory conclusion.

### "Remarks.

"We have adopted the mileage at 959.50, because the railroad company has adopted it as to mileage. Then, again, it would not be proper to adopt the main line mileage for Tennessee on an average valuation, for the reason that there is practically no main mileage in Tennessee, and it would be ridiculous to simply assess .40 of a mile of road on a 'main line' basis.

"The property belonging to this corporation in Tennessee consists of terminal facilities, the corporate existence of the railroad assessed being outside of Tennessee.

| | |
|---|---:|
| The cost of the property is | $25,519,675 80 |
| The bond value of the company is | 17,361,000 00 |
| The net earning value of the property is | 14,057,472 90 |

"It will be seen that the net earning value is very much less than either of the other bases.

"Suppose we take the last basis—net earnings—we have:

| | | |
|---|---:|---:|
| Value of the property on net earning basis | | $14,057,472 90 |
| Deduct from this: | | |
| Localized property in other states | $418,256 | |
| Localized property in Tennessee | 62,904 | |
| | | 481,150 00 |
| Value distributable property on this basis | | 13,576,322 90 |
| Value per mile (959.50 miles) | | 14,148 00 |
| Value mileage in Tennessee, distributable property, 21.16 miles | | 299,371 68 |

"In order to show the average value per mile of this railroad property, we have, viz.:

| | | |
|---|---:|---:|
| Cost of property | $25,519,675 80 | |
| Or per mile (959.50 miles) | | $26,591 |
| Stock and bond value road | $18,834,980 00 | |
| Or per mile (959.50 miles) | | 19,629 |
| Net earnings value road | $14,057,472 90 | |
| Or per mile (959.50 miles) | | 14,650 |
| Average value per mile (959.50 miles) | | 20,285 |
| Deduct average mile value of localized property: | | |
| Localized property entire line | $481,150 00 | |
| Average value (959.50 miles) | | 501 |
| Average value distributable property per mile | | 19,784 |

### "Conclusions.

| | |
|---|---:|
| Value distributable and localized property in Tennessee, being in Memphis, Shelby county, Tennessee | $351,144 |
| Less localized property in Tennessee | 62,904 |
| Less exemption | 1,000 |
| Value retaining distributable property in Tennessee | 296,240 |
| Per mile | 14,000 |

"While we have not and could not very well value this property in Tennessee on a mileage basis, it consisting of terminal facilities, and being very valuable, if estimated on a mileage basis, it would be at $14,000 per mile.

"References.

"Schedule of railroad company, 1899.
"Deposition of Washburn, filed July, 1899.
"Annual statement of Kansas City, Fort Scott & Memphis Railroad Company, 1898.
"Quotation Supplement Commercial & Financial Chronicle, Jan., 1899.
"Assessment of the distributable property of the Kansas City, Fort Scott & Memphis Railroad Company property for the years 1899, 1900.

"The railroad commission of the state of Tennessee, acting ex officio as state tax assessors of railroad, telegraph, and telephone properties assessable for taxation in said state, after consideration of the distributable property of the above-named railroad, namely, its rolling stock, franchises, roadbed, side tracks, switches, bridges, trestles, ties, rails, and superstructures, pertaining to said roadbed, and all other property of said road other than localized property for the purpose of assessing the same for taxation, state, county, and municipal, for the years 1899 and 1900, find the terminals of said road to be Kansas City, Missouri, and Memphis, Tennessee, with 959.50 miles of entire main line, of which there is 21.16 miles of terminal line in Tennessee, and the number of miles, as hereinafter set out in each county and municipality of said main line, and compute the value for assessment for taxation of the said distributable property of the said road, and do so value the same for taxation, state, county, and municipal, for the years 1899 and 1900, as hereinafter set out to be apportioned, state, county, and municipal, as hereinafter set out. viz.:

Value of distributable property of entire line of road, 959.50 miles .................................................... $13,434,000
Less legal exemptions........................................ 1,000
Assessable balance in Tennessee.............................. 296,240
Assessable value per mile.................................... 14,000

"Apportionment for Tennessee.

21.16 miles at $14,000.00 per mile........................... 296,240

"Apportionment for Counties.

"Shelby.

21.16 miles at $14,000.00 per mile........................... 296,240

"Apportionment for Municipalities.

"Memphis.

21.16 miles at $14,000.00 per mile........................... 296,240

"N. W. Baptist, Chairman.
"J. N. McKenzie, Com.
"T. L. Williams, Com."

To this assessment the appellant company filed exceptions as follows:
"(1) It has assessed to the Kansas City, Ft. Scott & Memphis Railroad Company 21.16 miles of railroad in Tennessee, when in truth and in fact said company owns in the state of Tennessee only 18.18 miles of main and side track combined, and a half interest in 2.25 miles of track which has been assessed by this road as main line for the Kansas City, Memphis & Birmingham Railroad Company, at the rate of $1,600 per mile, and also a half interest in .726 (or, roughly speaking, .73 of a mile) of side track situated upon Broadway, in the city of Memphis, all of which was returned for assessment as the property of Kansas City, Memphis & Birmingham Railroad Company. The net result of the action of the board in this matter is that the 2.25 miles of main line of the Kansas City, Memphis & Birmingham Railroad Company, in which this company has a one-half interest, now stands assessed at $14,000 per mile in the name of this company and $18,000 per mile in the name of the Kansas City, Memphis & Birmingham Railroad Company, or $30,000 per mile.

"(2) This board has pursued a method forbidden by statute in arriving at the value of the distributable property of this company, in Tennessee, in

this, to wit, it found the aggregate value of the property of the company, wherever situated, and, after deducting exemptions and localized property in Tennessee, divided the remainder by the aggregate number of miles of main and side track, wherever situated, and multiplied the quotient by the aggregate number of miles of main and side track in Tennessee, whereas the statute laws of the state of Tennessee require the aggregate value of the property, less exemptions and localized property, to be divided by the number of miles of road, excluding side track, and multiplying the quotient by the number of miles of main line track in Tennessee. This is the construction put upon the statute by this board in assessing all other railroad property in Tennessee, and this company says that the same rule should be applied to the assessment of its property.

"(3) The value put upon its property of $14,000 per mile is excessive."

·After hearing, the board of assessors sustained the first exception, and reduced the assessment for the years involved, 1899 and 1900, from 21.16 miles to 18.18 miles. The second and third exceptions were overruled. The assessment, as corrected, amounting to $254,452 for the years 1899 and 1900, with the records and papers, was duly certified to by the state board of equalizers, and was approved and confirmed by that body. Thereupon this bill for injunction was filed. Upon hearing it was dismissed by the Circuit Court.

C. H. Trimble, for appellant.

Charles T. Cates, Jr., for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

DAY, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

A preliminary question is made as to the right of a court of equity to entertain jurisdiction of the bill for injunction in this case. The objections raised in this proceeding to the legality of the assessment do not appear upon the face of the proceedings, but arise because of facts set forth in the bill, which show, as is alleged, unlawful discrimination in the assessment of the property of the complainant. This tax, by the law of Tennessee, becomes a lien upon the property. It creates an apparently valid incumbrance, which casts a cloud upon the title. We think it is settled that in such case the federal courts in equity may entertain a bill to inquire into the validity of the proceedings, and remove the cloud if the assessment shall turn out to be illegal. Ogden City v. Armstrong, 168 U. S. 224, 238, 18 Sup. Ct. 98, 42 L. Ed. 444. Upon this branch of the case nothing need be added to the full discussion of the subject in the opinion of Judge Taft, speaking for this court, in Taylor v. Railroad Co., 31 C. C. A. 537, 88 Fed. 350.

The complainant seeks an injunction against the collection of the taxes assessed upon the grounds that the method pursued by the assessors in reaching a valuation was unauthorized by law, and contrary to the uniform practice of the assessors in valuing other railroad property in Tennessee. It is claimed that this property, other than the localized property, should have been assessed by following the method pointed out in section 7 of the act above quoted; that is, by dividing $13,434,000, the assessed value of the entire distributable property, by 675.19, the number of miles of main line, excluding side track, and multiplying this by 2, the number of miles of main line in Tennessee; this 2 miles being arrived at by treating the two pieces of .4 of a mile and 1.6 miles, used for making connections with other railroads

and reaching its depots, as the length of main line in Tennessee, the remainder of the 18.18 miles in Memphis to be regarded as side tracks and spurs for yard and freight purposes, and not to be considered in determining the length of the road as defined in section 7. The purpose of this statute is to provide a scheme of assessment which shall provide an adequate means of taxing railroad property in Tennessee. In a general way it is intended to classify this kind of property into the "distributable property" described in section 7, consisting of road-bed, rolling stock, franchises, choses in action, and personal property having no actual situs, and the "localized property," consisting of depot buildings and other property, real, personal, and mixed, having an actual situs. The valuation of that embraced in the former class is to be distributed along the entire length of the road, according to the mileage in the respective taxing districts for state, county, and municipal purposes. The latter class is to be taxed according to its actual situs in the county or town where it is located. The tax assessors, as shown in their report, recognized that they were dealing with a peculiar situation. The terminal property of the appellant is composed of a large number of tracks, a network in fact, used to make connections, and to afford storage room for cars, and the means of handling, receiving, and delivering freight and making connections— a situation which may be generally described as embracing the terminal facilities of this railroad at Memphis. It is insisted for the railroad company that only that small portion of some two miles connecting with other roads can be regarded as main line, and included in the "entire length of the road," for the purpose of tax distribution under the statute. It is claimed that in this way the statute is consistently carried into effect, and this company taxed by the method which prevails in assessing other railroads in the state. It appears that in assessing a railroad traversing the state, which it is claimed the complainant's does, it has been the practice to find the "length of the road" without including side tracks, and assess the distributable property by multiplying the value per mile by the number of miles in the state included in the length of the road as thus ascertained. The practice of taxing distributable property by this mileage method is quite common, and is prescribed by statute in a number of the states. This means of reaching and distributing the value of railroad property for the purposes of taxation has met with approval in a number of Supreme Court decisions. They are collected in the opinion of Mr. Justice Brewer in Railroad Co. v. Backus, 154 U. S. 421, 14 Sup. Ct. 1114, 38 L. Ed. 1031. Conceding the fairness of the mileage basis under usual circumstances, the learned justice adds:

"It is true, there may be exceptional cases—and the testimony offered on the trial of this case in the Circuit Court tends to show that this plaintiff's road is one of such exceptional cases—as, for instance, where the terminal facilities in some large city are of enormous value, and so give to a mile or two in such city a value out of all proportion to any similar distance elsewhere along the line of the road, or where in certain localities the company is engaged in a particular kind of business requiring for sole use in such localities an extra amount of rolling stock. If testimony to this effect was presented by the company to the state board, it must be assumed, in the absence of anything to the contrary, that such board, in making the assessment of track and rolling stock within the state, took into account the peculiar

and large value of such facilities and such extra rolling stock. But whether, in any particular case, such matters are taken into consideration by the assessing board does not make against the validity of the law, because it does not require that the valuation of the property within the state shall be absolutely determined upon a mileage basis."

These observations are pertinent to the present inquiry. The statute of Tennessee must be considered in all its parts ·as a means of carrying into practical effect the requirement of the state constitution that all property shall be taxed according to its value, so that taxes shall be equal and uniform throughout the state. It is the primary duty of the assessors to ascertain the value of the property for taxation. Section 4, Act 1897. In arriving at the valuation, the assessors are enjoined to have in view and look to the capital stock, the corporate property, franchises, and gross receipts of the company. To this end they are authorized to examine persons under oath, require the production of books and papers, and issue summons for witnesses. Section 5, Id. Testimony may be taken in addition to the schedule furnished by the company, to enable the assessors to better arrive at the true value of the property. These powers are conferred for the purpose of enabling the assessors to arrive at the true value of the property. Section 10, Id. For like purpose rules are laid down in sections 6 and 7 of the act of 1897. In section 6 it is provided that the road of any railroad shall include all "said" (side) tracks, switches, bridges, trestles, ties, rails, and superstructure of every kind. Section 7 provides a rule for distribution of the valuation of the property having no actual situs. Undoubtedly, wherever applicable, this rule must be followed, and in most cases it will work substantial justice; but as was said by Mr. Justice Brewer in Railroad Co. v. Backus, 154 U. S. 421, 14 Sup. Ct. 1114, 38 L. Ed. 1031, the law does not require that the valuation of the property within the state shall be absolutely determined upon the mileage basis. In the case in hand we cannot perceive any reason for calling the connecting part of these terminal tracks main line and the balance side tracks. We have a situation·where the "length of the road" rule, as construed in practical application to other roads differently situated, will not afford a means of reaching the value of the property of this company in Tennessee. To treat the two miles as main line, and as furnishing a number by which to multiply the total valuation, divided by the number of miles of main line of the whole road, will value this property at about $39,000—a sum which the testimony discloses to be so far below its true value as to give an absurd preference to this property in taxing railroads in Tennessee. This situation was apparent to the assessors, as their report discloses. While the mileage rule was inapplicable, they were, nevertheless, authorized by the statute to value this and all other property of the company in Tennessee for taxation. This property was not to be valued as a distinct and separate entity, but was to be treated as a part of the system to which it belonged. The principle had frequently been recognized by the courts. In Franklin Co. v. Nashville, C. & St. L. Ry. Co., 12 Lea, 521, 539, it was said:

"The value of the roadway at any given time is not the original cost, nor, a fortiori, its ultimate cost, after years of expenditure in repairs and improvements. On the other hand, its value cannot be determined by ascertaining the value of the land included in the roadway, assessed at the market price of adjacent lands, and adding the value of the cross-ties, rails, and spikes. The value of the land depends largely upon the use to which it can be put and the character of the improvements upon it. The assessable value for taxation of a railroad track can only be determined by looking at the elements on which the financial condition of the company depends, its traffic, as evidenced by the rolling stock and gross earnings in connection with its capital stock. No local estimate of the fraction in one county of a railroad track running through several counties can be based upon sufficient data to make it at all reliable, unless, indeed, the local assessors are furnished with the means of estimating the whole road."

This language was quoted with approval in Railroad Co. v. Wright, 151 U. S. 470, 479, 14 Sup. Ct. 396, 38 L. Ed. 238, and in Railroad Co. v. Backus, 154 U. S. 429, 14 Sup. Ct. 1114, 38 L. Ed. 1031. The report of the assessors shows that the distributable property was valued upon the basis of the net earnings of the road at $13,434,000. No complaint is made of this valuation, and it is less than an assessment would be based upon either the cost of the road or its stock and bonds. In their report the assessors say:

"While we have not and could not very well value this property in Tennessee on a mileage basis, it consisting of terminal facilities, and being very valuable, if estimated on a mileage basis, it would be at $14,000 a mile."

One of the railroad assessors, in giving testimony, says of the method pursued in valuing this property:

"Under our construction of the assessment law for 1897, the railroad commissioners were of opinion that, if they could arrive at the value of all the property belonging to a corporation in the state of Tennessee by dividing the aggregate value of all said property by the main mileage, that they could do so, but that they had the right, if they saw proper, in arriving at the value of all the property of a railroad corporation in Tennessee, to divide the aggregate value of the property by its entire mileage, main and side track included; and in assessment of the Kansas City, Ft. Scott & Memphis Railway, as it was impossible to arrive at the value of the distributable property of this corporation in the state of Tennessee by assessing only .4 of the mile of main track, they assessed it with 18 miles of track, according to Mr. Bontecou's deposition, which was the main and side track of said road in the state of Tennessee. The commission took the aggregate value of the property, as arrived at by them, and divided it by the entire mileage of the railway, as set out in the annual statement, both main and side track, thereby arriving at the value of the road per mile, and multiplying the sum thus found by the mileage in Tennessee (18.18 miles), thus arriving at the assessable value of the property. This was the plan pursued for 1897 and 1898, was accepted by the railroads, and the commission did the same for 1899 and 1900."

In other words, the assessors treated the 18.18 miles of the Memphis terminals as so many miles of the entire road, and gave it a proportionate part of the distributable property. As the mileage plan, which would distribute this assessment by the number of miles of the length of the main line, was wholly inapplicable, and as the assessors were given ample authority to fix a valuation upon this property, it must be assumed that the Legislature intended to grant

sufficient authority as to ways and means to the assessors to enable them to reach the true valuation of the property to be taxed in Tennessee, considered as a part of the whole property. It is shown without contradiction that the valuation placed upon the terminal property is not excessive, either as regards its intrinsic worth or by comparison with the assessments of other railroad property in the state. A court of equity will only interfere in clear cases to enjoin the levy and collection of taxes. It has no power to set up its own methods, and order taxes to be levied as it may see fit. As was said by Mr. Justice Miller, speaking of the right to interfere by injunction, in State Railroad Tax Cases, 92 U. S. 613–615, 23 L. Ed. 663, quoted with approval by Mr. Justice Gray in Pittsburg, C., C. & St. L. R. Co. v. Board of Public Works, 172 U. S. 32–39, 19 Sup. Ct. 90, 43 L. Ed. 354:

"One of the reasons why a court should not thus interfere, as it would in any transaction between individuals, is that it has no power to apportion the tax or make a new assessment, or to direct another to be made by the proper officers of the state. These officers, and the manner in which they shall exercise their functions, are wholly beyond the power of the court when so acting. The levy of taxes is not a judicial function. Its exercise, by the Constitutions of all the states, and by the theory of our English origin, is exclusively legislative. A court of equity is, therefore, hampered in the exercise of its jurisdiction by the necessity of enjoining the tax complained of, in whole or in part, without any power of doing complete justice by making or causing to be made a new assessment on any principle it may decide to be the right one. In this manner it may, by enjoining the levy, enable the complainant to escape wholly the tax for the period of time complained of, though it be obvious that he ought to pay a tax if imposed in the proper manner."

In this case the method adopted by the commissioners has not resulted in any overvaluation of complainant's property, or discrimination against it as compared with other railroads whose property is taxed in the same state, and is within the powers conferred by statute upon the assessors.

We perceive no ground for interference by injunction in a court of equity. Decree affirmed.